UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GAMALIEL ELIZALDE,

        Plaintiff,

    v.

WILLIAM MUNIZ,

        Defendant.

Case No. 16-cv-04607-WHO

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Re: Dkt. No. 1

## INTRODUCTION

Petitioner Gamaliel Elizalde seeks federal habeas relief from his state conviction on the grounds that the trial court erroneously admitted uncorroborated accomplice testimony and hearsay evidence; there was insufficient evidence to support his conviction as a co-conspirator; defense counsel rendered ineffective assistance; the trial court erroneously instructed the jury; and the cumulative effect of errors denied his right to due process. His claims fail because they do not allege a violation of any clearly established federal law, because they are procedurally defaulted, or because they do not demonstrate that the state court decision was contrary to or involved an unreasonable application of clearly established federal law. For the reasons set forth below, I will deny the petition.

## BACKGROUND

### I. FACTUAL BACKGROUND

Elizalde was convicted of the murders of Antonio Centron, Luis Perez, and Rico McIntosh based on co-conspirator liability. Opinion ("Opn."), Response to Order to Show Cause ("Ans.") Ex. 13 [Dkt. No. 35-8]. The following facts are excerpted from the court of appeal decision affirming his conviction:

## A. *The Murders*

Defendants [Jose] Mota[-Avendano] and Elizalde were convicted of three murders that occurred over a four-month period between December 22, 2007, and April 25, 2008. Javier Gomez was convicted of one of the three, that of Rico McIntosh. The most significant testimony regarding these murders came from fellow gang members and/or friends, Jorge Sanchez (Centron murder), Victor Cervantes (Centron murder), Oscar Menendez (McIntosh murder), and Larry Valencia (Perez murder).

### 1. *Antonio Centron Murder*

Jorge Sanchez testified that in exchange for his testimony he pled to accessory after the fact to murder, and received a three-year suspended sentence. Sanchez, who was not in the country legally, also had a "parole in place" arrangement with Immigration and Customs Enforcement and, as a result, wore an ankle bracelet monitor. Sanchez testified that he was a member of Varrio Frontero Loco, a subset of the Sureño gang, which is active in Contra Costa County.

The evening of December 22, 2007, Francisco Romero, who was also a Varrio Frontero Loco, gathered together a number of people and went to North Richmond. When he arrived, Molina phoned defendant Gamaliel (Gama) Elizalde "because supposedly he was going to put a meeting to go up there, just fight them [the Richmond Sur Trace members]." After speaking to Romero, Elizalde came to North Richmond. Elizalde then tried to call a Richmond Sur Trace member in order to arrange a fight but was not able to reach anyone.

After the failed effort to engage the Richmond Sur Trace, Sanchez, Romero and Molina eventually drove to the Broadway area of San Pablo, which was known to be Norteño territory. Sanchez understood that if they found Norteños there they would beat them up or shoot them. He understood this "was part of the deal of being a ... [Varrio Frontero Loco] Sureño at this time."

That same evening, the victim, Antonio Centron, along with two friends, Neil Wixson and Adrian Espinoza, attended a party in the Broadway area of San Pablo. They stayed at the party for a couple of hours and then walked down Lake Street, toward 19th Street to buy beer. This area of San Pablo was a stronghold of the Norteño gang. Wixson and Centron wore red shirts, a color associated with Norteños. Centron walked a little ahead of his friends.

Romero drove by Centron, Wixson and Espinoza. Molina, who was in the right front passenger seat, told Romero he knew one of the three men. Molina pulled out a handgun and directed Romero to park down the next street. Romero parked and Molina ran out, and hid behind a fence, waiting for Centron, Wixson and Espinoza to come to the corner. When they did, Molina told them he was "VFL" and emptied his gun in their direction. His first shot hit Centron in the head. Centron died almost immediately. Nine more shots hit Espinoza in the back. Molina's final shot hit Wixson in the arm. Espinoza, who was still conscious (and ultimately survived his injuries), called 911.

After killing and wounding the men he believed were rival gang members, Molina ran back to the car and they sped off. In the car, Molina was jumpy and excited. According to Sanchez,

2

Molina said "to watch the newspaper. That's—that was going to be his trophy." A newspaper article about a killing was "[l]ike a signature that you did it." The killing would give Molina "more respect" in the gang. Molina called Elizalde to tell him what he had done. Elizalde arrived "and just started telling him just be quiet, stop, you know, screaming and just lay low."

The next day, the police detained and searched Molina. They found in his possession a .45 caliber chrome Colt semiautomatic handgun, a blue bandana, and a blue baseball hat. The police arrested him and charged him with possession of a concealed firearm. Molina was released from jail four days later.

Victor Cervantes testified that right after Molina got out of jail, he called Cervantes and asked for a ride home. Molina told him that he had killed one man and another was in a coma. He also told Cervantes that he had been with Francisco Romero when he had killed the man. Cervantes asked him how he got out of jail when he had been caught with a gun. Molina told him that he got caught with a different gun than the one used in the killing and, as a result, he had gotten away with murder.

In an interview with the police, Luis Ruelas testified that Molina admitted to him that he was in the car with Romero and Sanchez that evening and that Molina said he had shot at three men and killed one of them.

Defendants Elizalde and Mota were found guilty of Centron's murder as coconspirators.

### 2. *Luis Perez Murder*

Larry Valencia was one of the prosecution's main witnesses with regard to the murder of Luis Perez. Valencia had not made a plea bargain with the district attorney's office, nor was he receiving any witness protection or money from the district attorney's office.

Valencia testified that late on the night of February 16, 2008, he decided to visit friends in North Richmond. After an evening of drinking beer, smoking marijuana and taking Ecstasy someone said, "[l]et's jump for a ride. Let's go find some females to party." Hector Molina, Jorge Camacho, and Jose Mota got into Mota's black, two-door Kia. Molina sat in the driver's seat, with Jorge Camacho next to him in the passenger seat and Mota in the back. Cole Azamar and Luii Hernandez got into Azamar's car, with Azamar driving and Hernandez sitting in the passenger seat. All five men were members of Varrio Frontero Loco. They encouraged Larry Valencia (who testified that he was not a gang member) to join them and he got into the backseat of Azamar's car. After the two cars drove around for a while, with Azamar following Molina, they arrived in San Pablo. Valencia was aware that this was Norteño territory.

Molina stopped the car and Valencia saw the people in Mota's car arguing with a man in a red jacket—the victim, Luis Perez—who was standing next to the car. He saw Camacho get out of the car and say to the man, "[s]how me your hands, show me your hands." The man yelled "[w]hat the fuck is going on?" Valencia heard three loud shots and saw Camacho shoot the man three or four times. In fact, Camacho hit Perez seven times: two bullets to the abdomen, two to the back and three to the back of his arms. The bullets passed through Perez's lungs, heart and liver. Perez died en route to John Muir Medical Center in Walnut

3

Creek.

Camacho got back into the car with Molina and Mota and Molina drove away. Valencia had never seen anyone killed before. Valencia told Azamar to take him back to his car so he could go home.

Mota was found guilty of Perez's murder on an aider and abettor theory. Elizalde was found guilty as a coconspirator.

### 3. *Lisa Thayer*

The third victim, Lisa Thayer, died when Jorge Camacho, a member of Varrio Frontero Loco, exchanged shots with several unidentified men in a Toyota minivan.

This altercation began late in the afternoon of February 27, 2008. Camacho and his friend Antonio Solomon, were walking on San Pablo Avenue in San Pablo.6 Solomon was wearing a New York Yankees hat. In that area, that kind of hat was understood to stand for "Young Narfer," a reference to North Richmond, which was Sureño territory.

A burgundy Toyota minivan with a Hispanic driver and front seat passenger and African–American passenger in the backseat passed Solomon and Camacho. Solomon and Camacho ran.

The men in the minivan chased them. Eventually, the minivan pulled up behind Solomon and Camacho. The side door opened, revealing that the backseat passenger had a gun. Camacho shot at the van with the same nine-millimeter semiautomatic handgun he used to kill Perez. He fired nine times. The man in the van also fired a .40-caliber semiautomatic handgun several times.

Lisa Thayer, who was walking on San Pablo about half a block from the shooting, was hit by a bullet. The bullet hit her in the back, went through her right lung and came out at her chest. Thayer died soon afterwards.

Solomon and Camacho ran from the scene with the van following them. Someone in the van fired several more shots at them. Soloman and Camacho climbed a fence and ran to the apartment of a friend—Ignacio Mendoza. When Mendoza's mother told them to leave, Camacho gave his gun to Mendoza and left with Solomon. The police arrived nearby, a witness pointed them out and they were arrested. Camacho had a blue bandana in his pocket.

The jury found defendants Mota and Elizalde not guilty of Thayer's murder.

### 4. *Rico McIntosh*

The fourth shooting occurred in the early morning hours of April 26, 2008. Oscar Menendez, who was present at the shooting, testified that he had pleaded to accessory to the murder of McIntosh with a gang enhancement. He was given three years' probation. As a condition of his plea, he agreed to testify in court. At the time he testified he was in "parole in place," which meant he wore an ankle monitor required by Immigrations, Customs and Enforcement. The People were assisting him in obtaining a work permit. Menendez had not

4

violated any of the terms of his probation or the terms and conditions imposed by Immigration, Customs and Enforcement. He did not receive any money from the district attorney's office.

Menendez testified that he had known Mota for several years. Mota was a member of Varrio Frontero Loco. Menendez also knew Javier Gomez. The three of them hung out together and "sometimes we used to get in the car and just cruise around." Gomez belonged to a Sureño subset called Mexican Loco. Menendez had been at parties where members of the two Sureño subsets would brag "about crimes they have done during the week or, you know, any stuff that they doing, you know, like beating somebody up or robbing people or whatever crimes they do, they used to brag about all of the time." Six months before the McIntosh murder, Menendez became a Sureño.

Menendez described an incident that occurred about a week and a half before the McIntosh murder. He, Gomez and Mota went to visit Gomez's cousin who lived in Montalvin, which was Norteño territory. Mota drove his Kia, and Gomez sat in the front passenger seat. Menendez sat in the back. The cousin was not home, so they turned around to return to Richmond. As they did so, Gomez and Mota saw a man wearing red who was fixing his car. Mota and Gomez "said he was a Buster. He was wearing red...." Menendez did not agree and when he saw that Gomez and Mota had a gun8 in the front seat he told them to drop the gun. Menendez tried to grab the gun and in the ensuing scuffle, someone shot Menendez in the leg.

Menendez was bleeding heavily, so Mota and Gomez took him to the hospital. The police questioned Menendez and he lied and told them that they had been jumped and he had been shot in the leg because he told his assailants that he did not have any money.

Several weeks later, Gomez and Mota pulled up to where Menendez was hanging out with some friends and "they were calling me, right, and I went to the car and they say get in the car. I was like where are you guys going? They said don't trip." As on the other occasion, Mota was driving and Gomez was in the front passenger seat. Menendez asked if his friend could go too, and Mota told him he could not. Menendez got in the car and they decided to go to a McDonald's on San Pablo near Broadway. Instead of turning right into the McDonald's, however, Mota turned left onto Broadway. Menendez asked Mota were he was going and he said "don't trip." Mota kept driving. At this point, they were driving into Norteño territory and Menendez thought "they were looking for some Norteños ... or they were trying to do something again."

Gomez spotted three men wearing red at a stop sign. Mota stopped the car and asked the men if they were "busters." The men said they were not, and Menendez recognized one of them and told Mota that "they don't bang...." Mota drove away but "he kept on mugging them."

Mota then spotted Rico McIntosh, who looked, to Menendez, like he was wearing a red bandana and had some "red on his pants, too." Mota and Gomez thought he looked like a Norteño. They pulled alongside McIntosh and Gomez asked him "if he is a buster." McIntosh said "what the fuck is a buster?" Menendez thought he heard Mota say "pull it out." He then saw Gomez reach down toward his leg. McIntosh made a gesture as though to reach for something and Menendez thought it was a gun. Gomez began to fire the gun out

5

of the window of the car. Menendez heard four or five shots. McIntosh fell and Mota and Gomez began to laugh. Menendez told them it was not funny and they told him he was a "pussy." Menendez said he wanted to go home. "I told them what they just did, it was wrong because I never seen somebody kill another person like that."

Mota and Gomez "seemed pretty happy, like they just won the lottery or something. They were really excited about it." Mota and Gomez wanted to celebrate, but Menendez asked to go home. On the way, Mota and Gomez talked and said, "Oh, you know, what the homies are going to say when they find out, or was he good, was he bad, you know they were saying that it was like, you know, it was like perfect. Perfect is no one sees them. [¶] No one seen us when we were there. When that happened there was no people at all, just that guy."

When they arrived at Menendez's house, Mota left the gun with Menendez. He told Menendez that he was on parole and could not have it.

A week or so later, Menendez went to a party with members of Varrio Frontero Loco and Mexican Loco. At the party, Gomez "started talking about it." Ruelas was also present, along with a number of other Varrio Frontero Loco and Mexican Loco members. Mota was also there.

Gomez confessed to the McIntosh murder. He told the police that Mota picked him up the night of the murder and the two of them went to look for Norteños. Mota gave him the gun he used to shoot Rico McIntosh. Mota's job was to drive until he saw a Norteño and then stop. Gomez did not plan to shoot anyone who was not a Norteño. After driving around for a while Mota and Gomez picked up Menendez. Menendez sat in the backseat. They continued to look for Norteños, slowing down to look and then ruling out a number of groups of people who were out that night. Eventually, either Mota or Menendez spotted McIntosh, who was walking down the street. Mota told him that McIntosh had some red on. Gomez "asked him, are you a Buster? And he said, what the fuck is a buster? He, he had a hoodie. Then he like, he pulled the hoodie down as if he wanted to do something, so I just shot him." He shot McIntosh until there were no bullets left in his gun.

After the shooting they went to a store and bought some beer and drank it at the cemetery. He gave the gun to Menendez. Menendez saw the whole thing from the backseat.

McIntosh was hit in the hip and buttocks. He was taken to John Muir Medical Center and released on April 28, 2008. The next day, McIntosh collapsed and died after blood clots caused by the gunshot wounds traveled to his lungs.

Gomez was convicted of second degree murder. Mota was convicted of first degree murder as an aider and abettor and Elizalde was convicted as a coconspirator.

**B. *Conspiracy and Gang Evidence***

Several witnesses testified to a conspiracy on the part of Mota and Elizalde to commit murders of rival Norteño gang members in order to restore the reputation and fortunes of the Varrio Frontero Loco.

6

**1.** *Jorge Sanchez*

Jorge Sanchez was a member of Varrio Frontero Loco.10 He joined because his older brother was in the gang. Sanchez's brother was a member of the Mexican Loco, another Sureño gang, and he joined the Varrio Frontero Loco because he wanted his own "name." He was "jumped in" to Varrio Frontero Loco, through a process he described as "[j]ust imagine three guys beating on one person, kicking him, beating him, just thumping on him" for 13 seconds. He had also helped jump people into the gang. Sanchez showed the jury a number of tattoos that signified his membership in Varrio Frontero Loco. Gang tattoos were important so people "won't mess with us."

A Sureño who wanted to prove himself would "[j]ust go to the streets. Beat up any Norteño you can think of to start with.... [¶] Just you earn respect and your stripes. Start shooting or just doing whatever you want." You would do this with other people "[t]o make sure you do it. Just to make sure you ain't lying about what you did." When Sanchez went out to attack Norteños, he would take a fellow Varrio Frontero Loco with him. He would do that for "backup." He would also do it to "make sure they do it, too. Make sure they look at you."

Sanchez understood that at the time of trial, Mota and Elizalde had "green lighted" him; that is, they had ordered him killed for talking to the police. Green lighting did not occur until the actual text of a statement made to the police was distributed "to the streets," generally through a defendant who received the statement from his lawyer.

Sureños were enemies with Norteños because they were "mixed people": "part Mexican ... they mix with Mexican black, Mexican white." You could tell who they were by "[t]he hair, the clothes, the grill that is like the gold teeth they wear. [¶] And if they got tattoos you look at tattoos, belts." In particular, Norteños had long hair, "all of the new clothes the black people be coming out with," and wore the color red, including red belts. Sureños identified themselves with blue bandanas and blue belts.

Sanchez was familiar with a number of Norteño subgangs including West Side Berkeley, Montalvin, and Varrio San Pablo. Each of them claimed a particular area. Varrio San Pablo claimed the area near Broadway and the Hilltop Mall.

As a Sureño, when he saw a Norteño he was supposed to "[t]ake off, just don't even think about it, just hit them up.... Just whoop his ass."

Varrio Frontero Loco used violence to scare "[j]ust the people, Norteños whoever—everybody, the blacks, the whites, the Asians." They did so "[j]ust so they won't mess with us.... [P]eople be picking on people. Sometimes people just look for a way out. And just make sure they scared of you instead of you being scared of them."

Fame mattered because it was a way of "representing my hood," "[j]ust to let people know ... where you are from." You did that by "doing a lot of things, shooting, selling drugs, getting money, cars, just whoop—whooping people in front of other people." A Varrio Frontero Loco would "throw it up" by telling someone who they were, just make sure they know it. Being feared by rival gang members was a good thing—"[y]ou can be walking the streets with no one, no one is trying to hit you up or something."

Gang members would get together and brag about what they had done in order to let people know that "if they mess with you they will get the same ... treatment." He would also get together with other Varrio Frontero Loco and plan future crimes "to get respect or to make people afraid."

With regard to nongang members, it was important to "let them know that ... we don't mess with you and you just don't mess with us."

Drug sales were a part of being a Varrio Frontero Loco. Sanchez "wasn't into that," but he had seen fellow gang member Gamaliel Elizalde selling drugs out of his backyard. He would sometimes give drugs to Mota to sell and Mota would brag about it. The drug sales were run out of Elizalde's house.

Varrio Frontero Loco held meetings to "check in with each other, to make sure what was going on with each other and just what kind of problems, like people got problems with someone, different rivals or with a Norteño or something." Sometimes the members would put money together for people in jail to use for "hygienes like toothpaste, soap, shampoo...." Elizalde was in charge of putting money "on the books" for the Varrio Frontero Loco members who were in jail. The meetings were not held often. Sometimes the meetings would take place at Victor Valencia's house and sometimes at Elizalde's house.

Occasionally, he and other members would "check," or beat up, a member who was not "putting in work or he ain't kicking it with us a lot...."

At the time Sanchez joined Varrio Frontero Loco in 2005 or 2006, it was led by a number of men, including Gamaliel Elizalde. Elizalde was an "OG" or leader, "the one you look up to.... The one[ ] that you go ask for advice." One of the benefits of being a leader was that he "get to kickback or just don't do a lot of things no more." A leader would not "fight somebody or put a lot of work in the streets, shooting, whatever, just get to just relax and let the other generation do their work."

A leader would have money from "things going on the side .... [¶] ... like they were selling drugs...." The leaders would use the "pee wees" or younger members "to distribute it...."

In 2007, there were several subsets of Sureños with whom Sanchez was familiar: his own gang, Varrio Frontero Loco, another gang called Mexican Loco and a third called Richmond Sur Trece. Although they were all Sureños, they did not always get along. In 2007, a Varrio Frontero Loco leader called "Toby" shot a member of a Richmond Sur Trece and fled, along with his brothers, to avoid being killed in retaliation for murdering a fellow Sureño. This left a void in the leadership of Varrio Frontero Loco, which was filled by Elizalde. As Sanchez put it, after Toby fled, "everybody was just going to Gama, so that's the only one who we look up to and who was there with us." Nevertheless, after Elizalde took over, Varrio Frontero Loco began to dissolve. "[E]verybody just try to take it their own way. It was—just disappeared. Some of them went to some other towns. People got scared because they got shot at, who was getting stomped on." At this point, Varrio Frontero Loco were "getting hurt" and "things were bad."

Sanchez testified that "we just had to get it back together." He and others referred to this as "bring[ing] the hood back." To do this, it was necessary to "recruit[ ] new people and try to

8

do more damage to the Norteños, to the streets." All of the Varrio Frontero Loco wanted to bring the hood back, including Elizalde. In terms of the hierarchy of Varrio Frontero Loco, Elizalde was the leader, and Sanchez was directly under him along with Mota, Ruelas, and several others.

Elizalde told the Varrio Frontero Loco that they had to "put in more work," "go to the streets, ride around the streets," "[m]ake sure they [the Norteños and everybody] know we around, we ain't gone." They would do this by "hit[ting] the streets, ride around, especially in Norteño territory." Sanchez explained that this was effective because the Norteños "don't expect us to go. They think we going to be scared. They think we going to just lay back. And we go there and they go, oh, man, they coming back and they coming back hard." In Norteño territory, "[i]f you see them just shoot them or whoop them, whatever you got. If you don't got no gun you just get out and do what you got."

Sanchez discussed this plan with all the Varrio Frontero Loco, including Mota. He did not talk to Elizalde about why he wanted to bring the hood back; he only knew that Elizalde "wanted it done."

According to Sanchez, he and Mota, along with Luis Ruelas, Luii Hernandez, and Cole Azamar were "the ones who was going to bring them back ... just the ones who got to take care of everything." They covered different parts of Richmond. In addition to attacking Norteños, they also recruited and "guided" "pee wees." Elizalde wanted them to "get into the high schools and expand the Sureños and hurt the Norteños."

Shortly before Sanchez was arrested, Mota came to his house. He was nervous because the police had been to his house. Mota told him that he (Mota) "went in the shootout." He also spoke to Jorge Camacho who told him that he "shot a lady."

## 2. *Oscar Menendez*

Oscar Menendez testified that at the time of the Rico McIntosh murder, he "was undecided" about being a Varrio Frontero Loco. He "didn't want it for my future ... it was just fine being with them, you know, being with girls and having parties, but I didn't like the rest that they used to do." He had a lot of Sureño mentions on his MySpace page, and he liked being around the gang because it "was fun because they always used to hang around with a lot of girls and they always used to have parties every weekend and, you know, beers and music."

He was aware that gang members "hunted and attacked Norteños." However, no one ever "told me to do it." He was never "jumped in." He associated with the Varrio Frontero Loco for six or seven months beginning in November 2007 until his arrest about a week after the McIntosh murder.

It was typical for gang members to brag about their crimes. He explained, "they say that's what they get respect because when they—when the rest of the guys knew what you were doing they will respect you more than what they do." This was a "big deal" to the Varrio Frontero Loco.

The Norteños were the Varrio Frontero Loco's rivals. Menendez knew what areas were Norteño territory. He also knew that if a Varrio Frontero Loco found a Norteño or saw one

he was to "beat him up and if you have a gun you have to use it." That is because the Varrio Frontero Loco "wanted to get rid of Norteños."

He knew both Javier Gomez and Victor Cervantes, both of whom were members of the Sureño gang, Mexican Loco. When he associated with these gangs he knew they got along "but not that much" at first.

According to Menendez, Varrio Frontero Loco "wasn't that much organized." He "never knew who was the shot-caller...." He was aware that the members "used to receive orders from some older guys...." When he asked what they were doing, the members would say "don't trip ... that's something that I got to do and that's it." In his own mind, he thought that Elizalde was the shot-caller because he once heard him giving orders to someone. At one point, Elizalde told Menendez that "in order to be a Sureño you have to get down, you know, don't have to be a fear of anybody, if you see a Norteño on the street you have to put him on check, beat him up or anything that is in your hands to get him away from Richmond, and to don't let them come to Richmond, let them stay in San Pablo." Specifically Elizalde told him that if he saw a Norteño he was to beat him up and if he had a gun to use it. Elizalde once told him that in order to be a Sureño he had to "stick with them all the time and commit sort of a crime that he used to commit—I had to do the crime that they used to do in the week and stick around with them and, you know, do whatever they—they were doing during the week." This would include "[s]tealing cars and robbing people, shooting Norteños, beat them up." Mota told him the same thing. He also told him that he had to "earn" a Varrio Frontero Loco tattoo by doing something "big" like kill a Norteño.

On three occasions, he heard Elizalde instruct someone to beat up a Norteño or to look for him. He also heard Elizalde say that Richmond was Sureño territory.

Menendez named a number of Varrio Frontero Loco as those with the most respect in the gang. They were Molina, Azamar, Camacho, Ruelas and Sanchez. He also knew Larry Valencia, who he did not think was a gang member.

He felt that he had to do what Elizalde told him to do. He did not, however, think that he had to hunt Norteños in San Pablo. When he went with Mota and Javier Gomez on April 13, 2008, which was the day he shot himself by accident, he did not know that they were looking for Norteños to kill. Nor did he think that was the case on April 26, 2008. He did not realize that they were looking for Norteños to kill until the car did not turn toward the McDonald's on Broadway as he had expected.

In jail, Menendez received a message on the module where he was housed from the Sureño shot caller. The message laid out in detail how he was to behave while incarcerated. Among other things, he was to contribute money to buy food and supplies for other Sureños, he was not to speak to the police, he was to follow orders from the shot caller and if he was asked, he was to beat people up the shot caller told him to attack. He was also required to give the shot caller a copy of the police report on his arrest as well as any other legal materials in order to permit the shot caller to determine whether he was a snitch. Menendez refused to give these materials to the shot caller and, several days later, he was beat up by several Sureños. He entered protective custody afterwards.

### 3. *Luis Ruelas*

Luis Ruelas testified that he was a member of Varrio Frontero Loco for six years until 2008. He was 14 or 15 years old when he was jumped into the gang. Jose Valencia brought him into the gang.

Ruelas's testimony before the grand jury was admitted into evidence. In that testimony, Ruelas told the grand jury that he had "earned" a tattoo that said "Chap Killa" on his arm. He worked his way up from the bottom of the gang by earning "respect" through shooting and beating up Norteños. Norteños were identified by the color red, while Sureños wore the color blue. Ruelas became close to one of the top people in Varrio Frontero Loco at the time, Victor Valencia. Valencia had secured their territory by running out another gang that had previously been there.

Ruelas was deported to Mexico and Victor Valencia fled the country. When Ruelas returned, Elizalde "was the main—was the kingpin at that time, but everything else was a mess on the streets." Elizalde was "moving all the drugs." With Victor Valencia gone, "[h]e took over all our stuff." Ruelas did not like Elizalde. Elizalde gave orders to kill people, including one occasion when Elizalde told Ruelas to "kill somebody because they popped his tires." He did not do it because at the time he was working as an informant with the San Pablo police. As part of his deal with the police, he promised not to participate in the commission of any crimes. Elizalde also would send Ruelas out to collect debts using violence.

On one occasion, before he returned to Richmond, Ruelas spoke to Hector Molina, who told him, "We miss you.... We bringing the hood back." According to Ruelas, "the whole part of being a Sureño" was to "assault or kill Norteños."

Ruelas's testimony at an earlier gang prosecution was also admitted into evidence. At that time, Ruelas testified that violence was an important part of bringing the hood back "[b]ecause if ... you don't have people be scared of you, they ain't going to respect you. They going to be like, you know, whatever. As long as you show them you really about it, they will think about it twice before they come at you." Violence also helped recruit new members who "seen what we were doing and they knew we had money. We had girls, we had everything. And they wanted it, too, so they started joining in."

At trial, Ruelas was reluctant to testify because of threats to his family. In general, he either outright denied or claimed to forget testimony he had earlier given about Varrio Frontero Loco. At trial, he testified that Varrio Frontero Loco did not have a structure in which there was a shot caller. Instead, there were people he looked up to, including Victor Valencia. Ruelas also had respect for Elizalde because he was his elder.

Ruelas showed the jury tattoos on his forearms that said "Chap Killa." A Chap, he explained, is a Norteño gang member. He had done a lot of crimes to earn the tattoo.

One of the rules of being a Sureño "is just you got to represent yourself the right way." To do that, you had to have respect, which you earned through loyalty. If a Varrio Frontero Loco saw a Norteño he was expected to get into a fight with the Norteño. He would sometimes go out and look for Norteños to fight. The Broadway area in San Pablo was one place the Norteños hung out.

He knew Elizalde because they "used to kick it outside his house." Elizalde was a Varrio Frontero Loco. He was older and "some guys came up to him for advice." Although he had earlier told the police that Elizalde was "running the streets," he had done so because "I was just trying to save my life from being prosecuted, but it was—what I said was wrong...." In general, he retracted a number of statements he made earlier in which he had identified Elizalde as the person who had taken over drug sales, the person to whom he would go if he needed a gun quickly, and as having a list of people that needed to be hit. He also did not remember telling the police that Mota brought a pound of methamphetamine to his house along with a gun and said he was going on a drug deal.

Opn. 18–28.

After Molina was arrested and being held for the murder of Luis Perez, he made six phone calls to his mother. Supplemental Clerk's Transcript ("Supp. CT"), Ans. Ex. 2 [Dkt. No. 31-5] 522–531. During the first phone call, Molina instructed his mother to contact Elizalde and used the three-way call feature to leave Elizalde a voicemail informing him that Molina was in jail. *Id.* at 526. During the second phone call, Molina's mother told Molina, "Uh, my god, but (Gama) says that you should—you should say no, no, no, I didn't do it, it couldn't have been me. I didn't do anything. To keep your word, and no, no, no." *Id.* at 527. Molina also spoke with Elizalde on this call, who instructed him to say that he did not commit the murder and did not know anything about it. *Id.* at 529.

## II.    PROCEDURAL BACKGROUND

On December 20, 2010,[1] the jury found Elizalde guilty of the following: count one, murder of Rico McIntosh on April 26, 2008; count two, conspiracy to commit murder and assault with a deadly weapon on April 26, 2008; count three, criminal street gang conspiracy on April 26, 2008; count four, murder of Antonio Centron on December 22, 2008; count five, murder of Jose Mendoza-Lopez on January 16, 2008; and count seven, attempted dissuasion of witness Victor Cervantes on July 21, 2008.[2] Opn. 17. Petitioner was tried with co-defendants Gomez and Mota, although there was a separate jury for Gomez because he had given a confession implicating Mota.

[1] The petition incorrectly cites the date as December 20, 2011.

[2] The jury did not convict on count six, murder of Lisa Thayer on February 27, 2008. Petition ("Pet.") ¶ 2 [Dkt. No. 1].

*Id.* at 37 n.1.

At trial, the State called Cervantes, Menendez, Ruelas, Valencia, and Sanchez to testify about their involvement with Varrio Frontero Locos and the killings. Opn. 25–31. The court instructed the jury that Sanchez was an accomplice as a matter of law. Answer ("Ans.") Ex. 4 6093 [Dkt. No. 35]. It submitted to the jury the question of whether Ruelas, Menendez, and Cervantes were accomplices as a matter of law. Opn. 26. The government cited to a Myspace post by Ruelas to corroborate his testimony. [3] *See* Opn. 65–66.

On November 19, 2013, the California Court of Appeal affirmed the judgment of the trial court on charges pertaining to Elizalde. *Id.* at 18. The Supreme Court of California denied Elizalde's petition for review. Ans. Ex. 22 [Dkt. No. 35-9] ECF page 158; *People v. Elizalde*, 321 P.3d 344 (Cal. 2014). This petition followed. Petition for Writ of Habeas Corpus ("Pet.") [Dkt. No. 1].

## LEGAL STANDARD

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.A. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

---

[3] According to the court of appeal: "Luis Ruelas testified that he posted a message on his MySpace page in order to warn gang members not to harm his family. The gist of the message was that if gang members 'touch my family their family can be touched, too.' The post read as follows: 'but dis goes to all da lil homies, stop listening to da big homies,they dnt give a fuck bout ya lil niggas, dnt listen to Stranger, dat nigga is a nobody in VFL. Just cus hes close to Gama dnt mean shit. He never did no, jales . . . and Gama just uses ya to take care of his shit. He dnt give a fuck bout ya.' He posted that the true members of VFL were 'Sleepy, Richy, Toby, Ruelas, Camacho, all do other VFLs except da pee wees are fucken suckas niggas.'" Opn. 65–66.

13

arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

## DISCUSSION

### I. CLAIMS BASED IN STATE LAW

The majority of Elizalde's claims center around alleged errors in the state court's application of state law. He asserts that the following errors denied him due process of laws: (i) admission of uncorroborated testimony in violation of California Penal Code section 1111; (ii) insufficient evidence to show the killings were committed in furtherance of a conspiracy; (iii) unlawful admission of hearsay in the form of phone calls between Elizalde, Molina, and Molina's mother; and (iv) admission of evidence of a prior drug arrest to show Elizalde's participation in the conspiracy.

#### A. Uncorroborated Testimony

Elizalde argues that Luis Ruelas, Oscar Menendez, and Victor Cervantes were accomplices as a matter of law, and the prosecution failed to present independent evidence to corroborate their testimony as required by California Penal Code section 1111. Pet. m-4; *see* Cal. Penal Code § 1111 ("A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense."). He asserts that his conviction rested on uncorroborated accomplice testimony in violation of state law, and the error in turn violated his Fourteenth Amendment due process right.

14

*Id.* at m-2.

The court of appeal addressed this claim in its November 19, 2013 opinion, and the Supreme Court of California summarily denied Elizalde's petition for review. Ans. Ex. 22. When a lower state court issues a written opinion, an unexplained order from a higher court that upholds the judgment is presumed to rest upon the same grounds. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002) ("In determining whether a state court decision is contrary to federal law, we look to the state's last reasoned decision . . . as the basis for its judgment."). The court of appeal's opinion is the proper subject of my review of this claim.

Elizalde's claim lacks merit. He is only entitled to relief if he can show that the court of appeal's ruling was contrary to or involved an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1). But the Ninth Circuit has determined that corroboration requirement embodied in California Penal Code section 1111 "is not required by the Constitution or federal law" as long as the uncorroborated testimony is not "incredible or insubstantial on its face." *Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000) (internal quotation marks and citation omitted). Elizalde does not assert that the allegedly uncorroborated testimony was incredible or insubstantial on its face. Accordingly, he is entitled to relief only if the alleged violation denied him his due process right to fundamental fairness. *See id.*

"A State violates a criminal defendant's due process right to fundamental fairness if it arbitrarily deprives the defendant of a state law entitlement." *Id.* (citing *Hicks v. Oklahoma,* 447 U.S. 343, 346 (1980). The Supreme Court has "long recognized that a mere error of state law is not a denial of due process." *Swarthout v. Cooke*, 562 U.S. 216, 222 (2011) (internal quotation marks and citation omitted). Instead, an error violates due process if it was a "denial of 'that fundamental fairness essential to the very concept of justice.'" *Gonzalez v. Wong*, 667 F.3d 965, 995 (9th Cir. 2011).

In order for my inquiry to reach Elizalde's due process arguments, he would have to show that there was a violation of section 1111. He cannot do this. The court of appeal refused to address his arguments on the merits because it found that he had waived his arguments by failing

to object at trial as required by California law. It wrote, "Elizalde has waived any objection to the trial court's ruling that Menendez, Ruelas, Sanchez, and Valencia were not accomplices as a matter of law. Elizalde told the court that he would 'rather leave it [the determination of whether these witnesses were accomplices] up to the jury.'" Opn. 25–26 n.15. Because California's contemporaneous objection requirement is an "independent and adequate state procedural rule," federal habeas review of Elizalde's underlying due process claim is barred unless he can show cause and actual prejudice. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991), *holding modified by Martinez v. Ryan*, 566 U.S. 1 (2012); *Ylst*, 501 U.S. at 806 (concluding that federal review was barred where the California Court of Appeal found procedural default because of failure to object during trial). Specifically, he must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. He did not do so. His petition raises no arguments related to cause, prejudice, or fundamental miscarriage of justice.

For all of these reasons, Elizalde has failed to show that there was a state law violation,[4] much less one that rises to the level of a due process violation.

## B. Insufficient Evidence

Elizalde claims that "even if the court rejects the accomplice corroboration argument" of the previous section, there was insufficient evidence to support the jury's findings that the killings were committed in furtherance of or were a reasonably foreseeable consequence of a conspiracy. Pet. m-9. The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner therefore must allege that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a

---

[4] The court of appeal did address the merits of Mota's claim under section 1111 because he had objected during trial. Opn. 26 n. 15. It found no error. *Id.* at 26–30. In addition, even assuming the trial court had erred in putting the accomplice question to the jury, the appellate court found there was no prejudice because the testimony was sufficiently corroborated. *Id.* at 30; *see* Ans. [Dkt. No. 30-1] 16.

rational trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 321, 324 (1979).

The government argues that Elizalde did not exhaust this claim because on appeal, he "never claimed that there was insufficient evidence even if [the four accomplices'] testimony could be considered." Answer 25. However, "new factual allegations do not render a claim unexhausted unless they fundamentally alter the legal claim already considered by the state courts." *Belmontes v. Brown*, 414 F.3d 1094, 1117 (9th Cir. 2005), *rev'd on other grounds, Ayers v. Belmontes*, 549 U.S. 7, 11 (2006)); *see Lee v. Adams*, No. C 08–1200 PJH (PR), 2009 WL 3762416, at *4 (N.D. Cal. Nov. 9, 2009) ("Although petitioner did not cite precisely the same facts in support of his federal claim as he cited in support of his state court appeal, he presented the same fundamental legal claim, that the evidence at trial was insufficient to support the jury's verdict."). For this reason, I will consider the merits of the claim.

The court of appeal determined that the jury's verdict was supported by substantial evidence that the conspiracy existed and that the murders were the foreseeable consequence of the conspiracy:

> Our review of the record indicates that substantial evidence supports the jury's conclusion that (1) Elizalde conspired with Mota to reestablish Varrio Frontero Loco by, among other things, murdering rival gang members and (2) the deaths of Centron, Perez and McIntosh were the natural and probable consequence of that conspiracy.
>
> Officer Brady of the San Pablo Police Department testified as a gang expert that in late 2007 and early 2008, Varrio Frontero Loco and the Mexican Locos were beginning to "clique up" together. Based on several murders that occurred as well as informant information, he believed that Gamaliel Elizalde was the "head shot-caller" of Varrio Frontero Loco. The gang was recruiting members and committing murders. He believed Elizalde and other members of Varrio Frontero Loco were attempting to "reestablish the gang."
>
> Sanchez testified that in the year leading up to the murder of Centron Perez and McIntosh, Elizalde was the leader of Varrio Frontero Loco. The gang was on the decline—members were being hurt and territory was disappearing. To counteract this state of affairs, Elizalde, along with Sanchez, Mota, Ruelas, and others, began to recruit new members. They also embarked on a campaign to "do more damage to the Norteños." Elizalde encouraged Varrio Frontero Loco members to make sure that the Norteños were aware that they were a present and powerful force by going into Norteño territory to beat up

or shoot anyone who appeared to be a Norteño. Menendez confirmed that this was, indeed, the understanding of the Varrio Frontero Loco members who "wanted to get rid of Norteños." Although Menendez was not sure, he believed that Elizalde was the "shot-caller." Ruelas confirmed Menendez's suspicion regarding Elizalde's role in the Varrio Frontero Loco. Ruelas also testified that Molina told him that they were "bringing the hood back" and violence against rival gang members was an important part of this effort.

In addition to substantial evidence that Elizalde was a significant player in a conspiracy to re-establish Varrio Frontero Loco as a powerful gang through violence—including murder—against Norteños, substantial evidence also supports the jury's conclusion that the deaths of Centron, Perez and McIntosh were the foreseeable consequence of the conspiracy to "bring[] the hood back." Centron, Perez and McIntosh were targeted because they appeared to be Norteños, the principal target of the Varrio Frontero Loco. Elizalde's argument that these murders were not foreseeable because the victims were outside Richmond, which was the area claimed by the Sureños, makes little sense. San Pablo was well known to be Norteño territory. Given that the Varrio Frontero Loco conspired to kill Norteños, they would generally do so in San Pablo, rather than Richmond.

The jury's verdict, therefore, is supported by substantial evidence. Opn. 60–61.

"*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference": the court of appeal's deference to the jury's verdict and the federal court's deference to the state court's decision. *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam). The initial question is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The state court's determination that the verdict is supportable "in turn is entitled to considerable deference under AEDPA." *Coleman*, 566 U.S. at 656.

In support of his *Jackson* claim, Elizalde merely argues that the jury reached the wrong verdict. Yet to succeed, he would have to show that the jury's conviction was "so insupportable as to fall below the threshold of bare rationality," *see Coleman*, 566 U.S. at 656, and that the court of appeal's decision reaching the opposite conclusion "was contrary to, or involved an unreasonable application of, clearly established Federal law," *see* 28 U.S.C.A. § 2254(d). Given all of the considerations outlined above, it was not objectively unreasonable for the court of appeal to determine that a rational trier of fact could have found Elizalde guilty beyond a reasonable doubt.

### C. Evidence Code

Elizalde alleges that the following misapplications of state law violated his due process rights: (i) admission of hearsay in the form of phone calls between Elizalde, Molina, and Molina's mother; and (ii) admission of evidence of a prior drug arrest. Pet. m-11–18, m-22–24.

"A state court's procedural or evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process." *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *see Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999). Even where evidence was admitted in error, a federal court can only grant the petitioner relief if "its admission violated fundamental due process and the right to a fair trial." *Henry*, 197 F.3d at 1031; *see also Johnson v. Chappell*, No. C 95-0305 TEH, 2014 WL 1920551, at *6 (N.D. Cal. May 13, 2014) ("The due process inquiry in federal habeas review is whether the admission of evidence was so arbitrary or prejudicial that it rendered the trial fundamentally unfair."). "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).

Admission of the phone call and 2007 drug arrest evidence did not violate Elizalde's due process rights. *See* Pet. m-22. The court of appeal did not find that the trial court abused its discretion in its decision to admit the evidence, and it is not my role to evaluate the admissibility of the evidence under California law. *See Estelle v. McGuire*, 502 U.S. 62, 67 (noting that a federal habeas court does not inquire into whether evidence was improperly admitted pursuant to state law). There were permissible inferences for a jury to draw from the evidence, and Elizalde does not argue that its admission violated a constitutional guarantee or otherwise rendered his trial fundamentally unfair. This claim fails.

### D. Jury Instructions

Elizalde next argues that the trial court erroneously instructed the jury regarding (i) accomplice testimony and (ii) use of Elizalde's prior arrest.

"[T]he fact that the instruction was allegedly incorrect under state law is not a basis for

habeas relief." *Estelle*, 502 U.S. at 71–72; *see also Duckett v. Godinez*, 67 F.3d 734, 744 (9th Cir. 1995) ("The fact that a jury instruction is inadequate by Ninth Circuit direct appeal standards does not mean a petitioner who relies on such an inadequacy will be entitled to habeas relief from a state court conviction."). Instead, the question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Estelle*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 146 (1973) ("[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional] right."). The challenged instruction should be viewed in the context of the remaining instructions as well as the entire trial. *See id.*

Elizalde argues that the court erred in instructing the jury on CALJIC No. 3.13 because it incorrectly allowed the jury to rely on Ruelas's Myspace post as corroboration. Pet. m-26. His claim fails. It is based entirely in state law, and any state law error is not the subject of habeas review unless it implicates due process. *See Laboa*, 224 F.3d at 979 (noting that neither the Constitution nor federal law usually requires corroboration for accomplice testimony). Due process is implicated in the context of jury instructions where they have the effect of lowering the burden on the prosecution to obtain a conviction, which was not the case here. *See Sullivan v. Louisiana*, 508 U.S. 275, 277–278 (1993) (finding that the failure to instruct correctly the reasonable doubt standard was constitutional error); *Carella v. California*, 491 U.S. 263, 265 (1989) (holding that instructions on presumptions related to elements of the crime relieved the government of its burden of proof). The court of appeal considered this claim and found not only that it was procedurally defaulted because of Elizalde's failure to object to the instruction at trial, but also that the instruction could not have been construed in the problematic way that Elizalde suggested. *See* Opn. 65–66. He presents no arguments to show that this determination was objectively unreasonable.

Elizalde next argues that the trial court violated his due process rights by instructing the jury that they could use his 2007 drug arrest as evidence to prove his motive, intent, and participation in a conspiracy. Pet. m-26–27. As noted by the court of appeal, the trial court warned the jury that they could use the evidence for a limited purpose:

20

> The court warned the jury that the evidence was "not admissible to suggest [that] Mr. Elizalde . . . has a bad character or a propensity to commit crimes, buy only on the predicate act elements of the gang charge and the gang enhancements . . . ." At the end of the trial, the court instructed the jury on the use of evidence that was admitted for a limited purpose (CALJIC No. 2.09 10) and evidence of other crimes (CALJIC No. 2.50).

Opn. 67. Elizalde argues that when the court instructed the jury as to the more general CALJIC No. 2.50, it effectively overrode the limiting instruction and told the jury they could use the 2007 arrest as substantive corroboration. Pet. m-27.

I agree with the government that the court of appeal effectively rejected this claim. It fails in any event. Jury instructions based in state law only give rise to habeas relief in the limited circumstances of a due process violation, and individual instructions are not to be viewed in isolation. *See Estelle*, 502 U.S. at 71–72. "In evaluating the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would—with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'" *Johnson v. Texas*, 509 U.S. 350, 368 (1993). Viewing the instructions together, the jury would have understood that they should apply the more general instruction where the specific one did *not* apply. For all of these reasons, Elizalde has not shown that he is entitled to habeas relief.

## II.     ASSISTANCE OF COUNSEL

Elizalde argues that he was denied effective assistance of counsel based on two errors by counsel and because of a change in the court's jury instructions.

To prevail on an ineffective assistance of counsel claim, a petitioner must show that (i) his counsel's performance was objectively deficient and (ii) this deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance was deficient if it "fell below an objective standard of reasonableness" as measured under "prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). It is the petitioner's burden to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. There is "a

strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (internal quotations omitted). To establish prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (internal quotations omitted). The question is whether the deficient performance resulted in a probability of error "sufficient to undermine confidence in the outcome" of the trial. *Id.* (internal quotations omitted). "That requires a substantial, not just conceivable, likelihood of a different result." *Id.* (internal quotations omitted).

Elizalde argues that defense counsel failed to (i) request redaction of the phone call between Molina and his mother and (ii) object to irrelevant and prejudicial evidence of uncharged crimes. Pet. m-29–33. The court of appeal considered and rejected Elizalde's claims under *Strickland*. Opn. 69–70. It determined that counsel was not deficient because the evidence Elizalde says counsel failed to object to was admissible. *Id.* It held that the phone calls were admissible because Elizalde's statements were a party admission and Molina's mother's statements were excited utterances.[5] Modification of Order ("Modif.") [Dkt. No. 35–8] 185. The evidence of uncharged acts of violence were admissible because they were relevant to Elizalde's participation and role in the conspiracy, and they were not overly prejudicial because of other evidence of other similar conduct by Elizalde. Opn. 69–70. Accordingly, the court determined that an objection to the evidence would have been futile. The question I must answer on habeas review is whether that determination was objectively unreasonable. *See Harrington*, 562 U.S. at 105 ("The standards created by *Strickland* and [AEDPA] are both highly deferential, and when the two apply in tandem, review is doubly so.") (internal quotations omitted). It was not.

Elizalde also claims that he was denied effective assistance of counsel because a change in the court's jury instructions rendered his counsel's legal strategy ineffective. Pet. m-27–29. The court initially indicated that evidence of Elizalde's 2007 drug arrest would be used only as a

---

[5] In its modification, the appellate court mistakenly referred to Mota instead of Molina

predicate offense, but later allowed it to be used as evidence of his participation in the conspiracy. *Id.* at m-28. In reliance on the earlier ruling, counsel conceded that Elizalde was a drug dealer but argued that he was not the VFL shot-caller. *Id.* When the instruction changed, this strategy effectively sealed Elizalde's fate. *Id.* The government counters that "[Elizalde] had no choice but to concede the prior drug crime" because there was ample evidence to demonstrate the arrest. Answer 57.

As noted above, the jury would not have understood the court's instructions as indicating that the 2007 drug arrest could be used as substantive evidence of the conspiracy. In addition, Elizalde's assertion that his counsel would have adopted a different strategy but for the court's jury instruction is speculative, and the evidence in the record about the drug arrest additionally undermines his argument. Even assuming he is correct, he cites no authority showing that potentially conflicting jury instructions rise to the level of a structural error, which arises when there is an error as great as a complete denial of the right to counsel. *See United States v. Cronic*, 466 U.S. 648, 658 (1984) (noting that circumstances such as a complete denial are "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified"). These claims are denied.

## III.    CUMULATIVE EFFECT OF ERROR

Finally, Elizalde argues that even if none of the alleged errors violated due process on its own, the cumulative effect was a denial of due process. Pet. m-33.

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may prejudice a defendant to the extent that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003) (noting that multiple constitutional errors "undermine[d] every important element of proof offered by the prosecution" and "left [the court] with the unambiguous conviction that the verdict in this case was not the result of a fair trial."). "[C]umulative error warrants habeas relief only where the errors have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007).

The court of appeal rejected Elizalde's cumulative error claim. The only error was related

to Mota's booking statement, and the court determined that "along with being the sole error in this case, it was harmless." Opn. 70. Elizalde makes no arguments showing that this determination was objectively unreasonable. This claim is denied.

## CONCLUSION

For the foregoing reasons, Elizalde's petition lacks merit. It is DENIED. A certificate of appealability will not issue. Reasonable jurists would not "find it debatable whether the petition states a valid claim of the denial of a constitutional right" or whether the procedural rulings herein are correct. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Elizalde may seek a certificate of appealability from the Ninth Circuit.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: June 11, 2019

William H. Orrick
United States District Judge